MERRELL-SOULE CO. v. POWDERED MILK CO. OF AMERICA et al.

(District Court, W. D. New York. July 9, 1914.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF DESICCATING MILK.

The Stauf patent, No. 666,711, for a process of desiccating blood, milk, and the like, as applied to the conversion of milk into a dry powder which can be dissolved in water with its characteristic freshness and purity unchanged, was not anticipated, discloses patentable invention, and is entitled to a fair range of equivalents. Neither was the invention first patented in a foreign country, so as to render the patent void under Rev. St. § 4887 (U. S. Comp. St. 1901, p. 3382) ; also *held* infringed.

2. PATENTS (§ 65*)—ANTICIPATION—PRIOR PATENTS.

Vague and indefinite suggestions in a process patent of an alternative process, which, so far as appears, has never been practiced or tested, are insufficient to anticipate a subsequent patent for a specific and proved process.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 80; Dec. Dig. § 65.*]

3. PATENTS (§ 66*)—VALIDITY—PREVIOUS PATENTING OF INVENTION IN FOREIGN COUNTRY.

A patent in this country is void, under Rev. St. § 4887, as amended in 1897 (U. S. Comp. St. 1901, p. 3382), only when it is primarily shown that the invention was first patented in a foreign country, and that the application for such patent was filed more than seven months before the application was filed in this country, and, for the purposes of such section, the date when an invention is "patented" under the German law is the "ausgegeben" date printed on the face of the patent when issued and not the date of the decision to grant the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 79, 81; Dec. Dig. § 66.*]

In Equity. Suit by the Merrell-Soule Company against the Powdered Milk Company of America, Wellington C. Patrick, and Dana R. Shedd. Decree for complainant against the corporation defendant; dismissed as to the individual defendants.

Livingston Gifford, of New York City, and Howard P. Denison and Eugene A. Thompson, both of Syracuse, N. Y., for complainant.

Archibald Cox and Robert W. Byerly, both of New York City, for defendants.

HAZEL, District Judge. [1] The bill herein was filed to enjoin the defendant corporation and the individual defendants from infringing United States letters patent, No. 666,711, granted January 29, 1901,

to Robert Stauf of Posen, Germany, and now owned by complainant, for an improved method of desiccating blood, milk, and the like. We are concerned in this action with the process of manufacturing dry powder from fresh milk rather than with the particular device or apparatus by which this is accomplished. The patent has a single claim, consisting of a series of steps, so phrased that a mere restatement of it will disclose the object of the invention, which reads as follows:

"The process of obtaining the solid constituents of liquids, such as blood, milk, and the like, in the form of powder, said process consisting in converting the liquid into a fine spray, bringing such spray or atomized liquid into a regulated current of heated air so that the liquid constituents are completely vaporized, conveying the dry powder into a suitable collecting space away from the air current, and discharging the air and vapor separately from the dry powder."

There are four essential steps in the claim: (1) The conversion of the fresh milk into a fine spray; (2) bringing the spray into a regulated current of heated air to vaporize the liquid constituents; (3) conveying the dry powder to a suitable collecting space away from the air current; and (4) discharging the air and vapor separately from the dry powder. The claim contains in terms no limitation as to the form of the devices used in practicing the process. The specification, in describing the nature and operation of the apparatus, says:

"A pipe a serves to supply air under pressure to the spray-nozzles b. The air under pressure draws the liquid to be operated upon from the vessels d through tubes c and projects the same in a finely-atomized condition—that is to say, as a fine spray—in oblique jets into the interior of a shaft-like casing e. At the lowest part of the said casing is provided a suitable source of heat—say, a gas-fire f. The air, admitted laterally through openings provided with suitable regulating devices or registers D is heated by the source of heat and rises. The spray of atomized liquid coming from the jets or nozzles b comes in contact and mixes with the heated air, and the watery constituents of the spray are evaporated. The steam and the dry particles are carried upward by the heated air and by a cone g, extending into the casing e, are guided into chambers h, surrounding the shaft e in the form of a gallery; said chambers being constituted by suitable casings closed at the top. The sides of said gallery are made of woolen fabric, mill-gauze, or like pervious material, permitting the air and vapors to pass and escape into the atmosphere, while the dry powder falls down and is collected in the hoppers i, whence it is removed by openings fitted with suitable closing devices, such as rotary valves or the like."

In addition to the foregoing, the complainant filters the air before it passes to the spray nozzle and regulates the current of air by varying the speed of a blower which forces it over steam coils into the drying chamber, but these are not thought to be patentable departures from the Stauf process.

The defenses are invalidity, noninfringement, and voidness of the patent in question because of the provisions of section 4887 of the Revised Statutes (U. S. Comp. St. 1901, p. 3382). These defenses will be considered in the order in which they are stated.

It is shown herein that, prior to the patent in suit, repeated efforts were made to convert milk into a form better adapted for commercial purposes than is its original form. One of the early methods employed

was the condensing and drying of the milk; later on, in accordance with the Just and Ekenberg processes, it was dripped on steam-heated rollers from which it was scraped off after being cooked. But none of these methods proved satisfactory, as the flavor of the milk was changed, its acidity increased, and it was incapable of complete solution in water. The art was therefore confronted with a difficult problem in the desiccation of milk which the complainant company solved by its process of transforming the milk into a fine powder wholly soluble in water.

There is evidence that the new process was independently discovered by Lewis C. Merrell, an officer of the complainant company, but that subsequently it was ascertained that the said process had already been patented by Stauf both in this country and abroad, whereupon the complainant company purchased the United States patent. The defendant company, while conceding Merrell's conception, nevertheless contends that the Stauf patent was incapable of successful commercial use, and that it taught no one how to practice the process under consideration, but I think the contrary fairly appears from an examination and analysis of the prior publications in evidence, upon which reliance is placed to prove anticipation or limitation of the claim in controversy.

The expert witness for the defendants makes reference in his deposition to many patents granted anterior to the patent in suit, in which it is claimed that spraying a solution into air to evaporate the water content and leave the solid in powder form is shown, but I am not satisfied that such was the fact. While there were a number of prior processes of one kind or another showing the spraying or injection of liquids into a chamber or casing, still none of them were shown to be capable of accomplishing the result of the patent in suit, and hence the presumption follows that such processes were incapable of so doing, as otherwise the skilled in the art would no doubt have quickly recognized the fact, and would have abandoned the objectionable Just, Ekenberg, and Campbell methods, to which reference has heretofore been made. Cimiotti Unhairing Co. v. American Unhairing Machine Co., 115 Fed. 498, 53 C. C. A. 230.

The prior art refers to a number of inventions relating to the concentration of milk at a low temperature or to the preparation of preserves or other substances by removing the water content, but nowhere is there any suggestion of a powder obtained by spraying, save in the Percy and La Mont patents. In the patent to Percy, granted 1872, there is described a process of desiccating liquids by atomizing, which comes close to the Stauf invention in controversy, but there is no evidence to show that such process was ever in practical use or capable of producing the result of the patent in suit. Had it been operative, it is quite unlikely that it would have remained unknown to dairymen and others who, long before the Stauf patent, were endeavoring to transform milk into a convenient form for commercial use. In his specification Percy declares that he brings fluid substances into minute division, the atoms coming in contact with currents of air or other gases, and he claims the principle of atomizing and desiccating simul-

taneously by dried or heated air, which is forced forward through a pipe, causing a division of the substances for the purpose of drying them. The description, however, fairly discloses that his process in important particulars was essentially different from the process in suit. I quite agree with complainant's expert witness Browne that starch or dextrine (the substances mentioned in the Percy patent) may be dried by a current of hot air ejected from a pipe, but the complete evaporation of the moisture in milk or blood by spraying depends upon more careful treatment. To successfully accomplish the latter, the sprayed particles, I think, must be driven into a current of air, so that they contact and mix with it in the casing during the period of evaporation. The witness Browne on this point testified as follows:

"Hot air cannot be furnished in sufficient volume through a spray nozzle to effect the drying of milk or blood in which there is a high moisture content. It is important in the Stauf process that the spray particles should be deprived of their moisture before they can settle upon any receiving surface, and this involves the supply of hot air in sufficient volume and at sufficient temperature to absorb all of the water in the milk or blood. Hence there must be a regulated current of heated air; sufficient volume and sufficient heat being supplied with due regard to the amount of water to be removed."

The Percy patent is devoid of any such disclosure. The success of complainant's process was owing to the fact that the milk was actually projected or sprayed into the current of heated air, and then borne upward by it into the receiving chamber. Defendants' expert witness Gunz, who claims that there was no important difference between the Percy process and that of the complainant company, seems to have ignored this important feature of the Stauf process. Nor is there any reference by Percy to discharging the air and vapor or deporting the dry powder away from the air current. It is evident that the Percy patent does not disclose the combination of elements of the claim in suit, and the mere possibility that it might be made to perform the function of the Stauf patent is not sufficient to predicate anticipation. Gordon v. Warder, 150 U. S. 47, 14 Sup. Ct. 32, 37 L. Ed. 992.

[2] The La Mont patent, No. 51,263, of November 28, 1865, to which importance is properly attached by defendants, was for drying a batter of beaten eggs by a current of heated air. After describing the preferred method of operation, this patentee suggests an alternative method; i. e., that the egg batter may be forced by means of a powerful blast of air into a thin spray, which falls through a current of heated air and then dries in fine particles. The specification is without a drawing, and it is difficult definitely to determine of just what the process consists. In this situation the following excerpt from Westinghouse Air Brake Co. v. Great Northern Railway Co., 88 Fed. 258, 31 C. C. A. 525, is not entirely inapt:

"The prophetical suggestions in English patents of what can be done, when no one has ever tested by actual and hard experience and under the stress of competition the truth of these suggestions, or the practical difficulties in the way of their accomplishment, or even whether the suggestions are feasible, do not carry conviction of the truth of these frequent and vague statements."

The phrase of the specification "fall through a current of heated air" is not explained, nor the manner in which the vapors are discharged

from the chamber or the powder collected away from the air zone. In the absence of proof that the La Mont suggestion of spraying egg batter and allowing it to fall through a current of air ever became operative, it may fairly be presumed that it never came into practical use. In his later patent No. 50,421, no mention is made of his method of spraying the batter, and I am entirely satisfied that the instrumentalities employed by him for carrying out his process were incapable of desiccating fresh milk and producing a powder completely soluble in water.

In the Walker patents, Nos. 285,187 and 347,846, the offal or meal is dried by means of heat contained in coils, but the specification says nothing of spraying a liquid into a regulated current of heated air. The expert witness for defendants also lays stress on the patents to Sherwood & Farnsworth, Downing & Hughes, Blackman, Haseltine, Bassler, and Newton, some of which were for condensing milk, glucose, tannin, etc., while others related to concentration of syrups or sugar juice, and, though in some instances such liquids were sprayed into a receptacle, no one of the patents was capable of producing a milk powder which could be dissolved in water with its characteristic freshness and purity unchanged. As these patents do not as closely approximate the patent here considered as do the patents to Percy and La Mont, they may be passed over with the simple comment that none of them discloses the combination of steps of the claim in suit. Even if, considering them collectively, we find that they disclose the series of steps of the patent in suit, they nevertheless are not anticipations, as, when considered singly, it is clear that each patent lacks an element possessed by the Stauf patent. Schmertz Wire-Glass Co. v. Pittsburgh Plate-Glass Co. (C. C.) 168 Fed. 73. Stauf, though not a pioneer in the broad sense in which that term is ordinarily employed, was nevertheless the first to spray a liquid into a regulated current of air to remove the moisture content, thus producing a fine powder which was carried to a collecting space outside the air currents, allowing the air and vapor to pass to the atmosphere.

As to infringement: Except as to a few unimportant changes, the apparatus of the defendant company for desiccating milk is not thought patentably different from complainant's. In the defendants' apparatus the force of heat of the Stauf patent (different, it is true, from "a gas fire f," but nevertheless the equivalent means for supplying heat suitably regulated to the casing or chamber) is applied by forcing the heated air, which is regulated by a fan, into the evaporating chamber after it has passed over steam coils. The liquid is sprayed or atomized into the heated chamber and instantly dried and vaporized, while a material quantity of the fine powder descends to the bottom of the chamber away from the air current; the remaining quantity being borne by the air current into a dust collector, which retains the solids as the air and vapor pass to the atmosphere through air escapes. I am unable to perceive any material dissimilarity in this adaptation of defendants under Brigham patent, No. 1,071,692, from complainant's. There is no doubt but that substantially the same result is attained by both. I think the defendants' process is fairly within the scope of the claim in

controversy, and, considering the progress made in the art by complainant's process, a fair range of equivalents should not be denied. The adaptation by the defendant company of a blower device in place of a natural draught for regulating the air, and of a fan for regulating the current, and its substitution of a duster for a screen to collect the powder, were mere changes of form from complainant's and do not avoid infringement. Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 Fed. 845, 48 C. C. A. 72.

There is contradiction in the testimony regarding the different products, the defendant company claiming that its product is more palatable than complainant's, but this fact, if it is a fact, is not thought of material importance. If there is a slight difference in the flavors of the two products, it is easily attributable to a variety of causes. The important fact remains that a milk powder, completely soluble in water, was produced by the defendant company by its adaptation of the process described in the specification and claim of the patent owned by the complainant company.

[3] Whether the Stauf patent in suit is void under section 4887 of the Revised Statutes depends upon whether the invention was first patented in a foreign country, as that term is legally defined, and whether application for such patent was filed more than seven months prior to the filing of the application in this country. There is dispute as to whether the Stauf German patent is for the same invention as the patent in suit, but in my opinion the processes in all essential particulars are the same. A comparison of the claims discloses only slight differences between them, such as the use of the term "current ascending from below" in the German patent as opposed to the term "regulated current" in the patent in suit, and the additional element of "discharging the air and vapor separately from the dry powder" found in the United States patent. While these differences and additions are probably not unimportant, I should nevertheless hesitate to construe the German patent so narrowly as to preclude their use, and therefore I am persuaded that there is such substantial identity between them as complies with section 4887, as amended; hence the principle announced in the case of Leeds v. Victor, 213 U. S. 320, 29 Sup. Ct. 495, 53 L. Ed. 805, holding that difference in combination is a substantial difference, does not strictly apply. But the contention that the Stauf invention was first patented in Germany prior to January 29, 1901, the date upon which it was given out, is not sustained by the evidence. The statute contemplates that the grant of a patent in this country is void only when it is primarily shown that the invention was first patented abroad, and that the application for such patent was filed more than seven months before the application was filed in this country. The dates of filing the applications, of their allowance, and of their issuance are as follows: June 12, 1899, German application filed. October 3, 1900, United States application filed. December 9, 1900, United States application allowed. January 9, 1901, German application allowed. January 29, 1901, United States patent issued. March 14, 1901, German patent ausgegeben.

Under the German law, as I understand the record, an application for patent is published on the day following the filing thereof, and a provisional protection is immediately accorded it. Later, when it is definitely decided to grant a patent, that fact is published and a so-called title deed prepared for the patentee. On the German document in evidence (the Stauf patent) there is printed the ausgegeben date, viz., "Ausgegeben den 14, Marz 1901," which complainant claims was the date of grant, notwithstanding an earlier decision by the board of patent examiners to allow the patent. The defendant company claims that such ausgegeben date merely constituted a publication of the patent for circulation and sale of copies, and that the actual date of patenting a German patent is the date of the decision by the board of examiners to grant the patent. The testimony of an expert witness, who claimed to be familiar with the German patent law, and who expounded it, together with excerpts from decisions of the German Imperial Court found in the record, are claimed to support the latter contention. I have carefully considered the subject, and am quite prepared to believe that a patentee under the German law secures certain monopoly rights during the pendency of the application, but that full and definite monopoly rights are not secured to him until after the Patent Office decision, when there is a sealing or issuing of the patent, which is evidenced by the ausgegeben date printed on the face of the patent. Until then there is no actual patenting. The German decisions in evidence do not appear to me to decide the precise question under consideration; but it is not an entirely new question in this country, having been previously decided in Queen v. Friedlander (C. C.) 149 Fed. 775, that the "publication or ausgegeben date is the date upon which the patent is actually issued," and in several other cases that the word "patented," as used in section 4887, means "the actual issuance of the patent under the seal of the government" of the foreign country. It was so held in American Co. v. Cushman (C. C.) 57 Fed. 842, and this holding was followed by Judge Shipman in this circuit in 1894 in the case of Edison Co. v. Waring Co. (C. C.) 59 Fed. 358, affirmed 69 Fed. 645, 15 C. C. A. 700. The amendment to the statute concededly has not altered the effect of these decisions, and Congress, in re-enacting the earlier statute, presumably adopted the interpretation of the judicial decisions bearing thereon rendered before the amendment. The Abbottsford, 98 U. S. 444, 25 L. Ed. 168; McDonald v. Hovey, 110 U. S. 619, 4 Sup. Ct. 142, 28 L. Ed. 269; Sedgwick on Const. Stat. 365; White v. Apollo, 209 U. S. 14, 28 Sup. Ct. 319, 52 L. Ed. 655, 14 Ann. Cas. 628. But the defendant contends that some of the decisions cited on this point (the Queen Case, for instance) were rendered under section 4886 of the Revised Statutes (U. S. Comp. St. 1901, p. 3382), which relates to an entirely different subject; section 4887 dealing with protection in a foreign country, while section 4886 deals with disclosures as anticipations of the alleged invention. This contention, however, is thought unsound. The word "patented," as used in both sections, when considered in relation to the issuance of the patent or the period from which the monopoly dates, has no different signification. Upon this point there was also evidence by the complainant to show that it is the practice of the

United States Patent Office to regard the ausgegeben date of a German patent as the date of grant and the time from which the monopoly runs. Such practice is not inconsistent with the decisions cited, which have had the subject of the dates of foreign patents under consideration.

There is no positive evidence to show that the individual defendants, who were formerly in the employ of the complainant company, violated their contract with the complainant to keep secret its modus operandi, or that they participated in any profits derived from the infringement. Indeed, the process, being a patented one, was open to the public, and the defendant company was free to discover it by a search of the files of the Patent Office. Both Patrick and Shedd, who, by the way, are not officers or stockholders of the defendant company, testified that they did not disclose the process or apparatus, or assist in originating the process adapted by the defendant company to its business, and, according to the witness Howe, the essential features of the process and apparatus were originated by one Brigham, who secured a patent for his improvement before the individual defendants entered the employ of the defendant company.

A presumption of bad faith sometimes arises from the employment of former employés of a competing concern operating under patent rights, but none is thought to exist in the present case, which would warrant holding Patrick and Shedd personally liable for the infringement, and therefore the bill is dismissed as to them, but the complainant is entitled to a decree, with costs, holding the patent in suit valid and infringed by the defendant company.