## MERRELL-SOULE CO. v. NATURAL DRY MILK CO.

(District Court, N. D. New York. October 22, 1914.)

PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — PROCESS OF DESICCATING MILK.

The Stauf patent, No. 666,711, for a method of desiccating blood, milk, etc., is for the same invention described and claimed in the original application, was not anticipated, and discloses patentable invention; also *held* infringed.

In Equity. Suit by the Merrell-Soule Company against the Natural Dry Milk Company. On motion by complainant for preliminary injunction, and by defendant to dismiss. Injunction granted, and motion to dismiss denied.

Motion by the complainant for an injunction pendente lite in a suit to restrain alleged infringement of the Stauf and other patents. Motion by the defendant to dismiss as to the Stauf patent, No. 666,711, dated January 29, 1901, application filed October 3, 1900.

Howard P. Denison and Eugene A. Thompson, both of Syracuse, N. Y., and Livingston Gifford, of New York City, for complainant.

Paul Carpenter, of Chicago, Ill., and Melville Church, of Washington, D. C., for defendant.

RAY, District Judge. The Stauf patent, on which the complainant mainly relied on the argument (patent to Stauf, No. 666,711, of January 29, 1901, for method of desiccating blood, etc.), has been the subject of judicial examination and determination in Merrell-Soule Co. v. Powdered Milk Co. of America (D. C.) 215 Fed. 922, Hazel, District Judge, who arrived at the conclusion that the patent is valid and had been infringed by the defendant there. That case is now on appeal, and, as there was a supersedeas, no injunction is now in force. I would content myself with a reference to and an approval of that decision, but for the fact that the defendant now brings forward and urges the patent to Williams (British), No. 22,655, applied for December 29, 1891, and issued October 29, 1892, as a complete anticipation, or as demonstrating that, in view of the prior art, the Stauf patent shows no invention and is void. Stauf, in his patent says:

"I * * * have invented certain new and useful improvements in methods of obtaining the solid constituents contained in liquid—such as blood, milk, and the like—in the form of dry powder."

His process in substance is to eject the milk through very fine spray nozzles upwardly and laterally into a chamber (and the milk may be made quite warm before being sprayed, but must not be cooked in the slightest degree then or thereafter while undergoing the process) having and maintaining a predetermined temperature, "because if the proper temperature should be exceeded the dried powder might readily be decomposed," says the patent. Here comes in one of defendant's criticisms. It urges that the patent fails to disclose the proper temperature, or any temperature, to which the milk may or should be subjected in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bringing about the desired result without decomposing the solids of the milk or changing their chemical properties, and that, therefore, no disclosure is made which will enable a person reasonably skilled in the art to practice the invention. But I think it is expressed and understood that the heat must be such, and kept under such control, that the milk will not be scalded or cooked in the slightest degree, and that this temperature is easily determined or well known.

At the bottom of this chamber into which the milk is ejected in this fine spray is a heating device, and its draught may be regulated by the admission of more or less air as desired. Hot air rises, but this rising of the heated air into which the milk is sprayed or thrown is made more acute or forcible by means of a pipe which supplies air under pressure to the spray nozzles carrying and ejecting the milk. It follows that the milk in the form of fine spray comes in contact and mixes with the rising heated air and is carried upwardly, and if the contact is long enough and the heat sufficient it will continue to rise and spread, if facilities for its spread be provided, and provision is made for the escape of the air at the top. At the top of this chamber or tower is another chamber of much greater lateral dimensions, and by suitable means this current of hot air is divided or diverted outwardly away from the mouth of the first chamber mentioned, and over a pit or pits which receives the dried milk or solids of the milk as it falls. The moisture passes out of this upper chamber into the outside world through a sort of web, such as cheese cloth or the like, which retains any particles of the solids still floating and causes them to drop into the pits.

We have a new structure for carrying out this process, but I see nothing patentable in the structure itself as a mere structure. But the process itself was new and novel and useful. Cooked milk, or partly cooked milk—scalded milk—with the solids partly or wholly chemically changed, and with the water evaporated, was old. For the first time in this art Stauf separated the solids contained in fresh or new milk from the water and retained the solids in such form (a powder) and in such unchanged condition that on mixing this powdered milk (so called) with water he had again fresh, sweet milk, with the same properties as before it underwent the process. His means for carrying out the process were new in combination and in application. There was no new element, except, perhaps, in mere shapes and forms, but his combination of these elements was new. Stauf, therefore, invented a new and a useful process of great value to mankind, and he also provided means for carrying it out, and taught the world how to use it, unless Williams (British patent, No. 22,655, of 1891) was ahead.

It will be noted and remembered that Stauf's process provides heat for heating the air, mainly all, if not all, supplied at the bottom of the drying chamber, and it is forced, and partly, perhaps, drawn upward. In its upward course it overtakes and comes into contact and mingles with the fine sprays of milk, also having a tendency to rise, and which is ejected upwardly from the spray nozzles, and mixed with air introduced from nozzles at the same time at the same place upwardly. Thus we have two ascending currents, one of air and sprayed milk mixed, and another of hot air coming from below, but all commingling in the upper part of the chamber. The arrangement and draught and process

·is such that the dried particles do not drop down on the heating apparatus, and the heat is so controlled and graduated that there is no scalding or burning of the milk when in vapor form or in the form of dried particles—powdered milk.

Now, turning to the Williams patent, we find that his is a process and an apparatus for "recovering salt from brine." His claims read as follows:

"1. As means for the recovery of salt from brine, or alkali, alum, or other salts from liquids, the employment of towers or upright hollow shafts into the upper end of which the brine or liquid is forced and sprayed, either with or without the aid of an air blast, the said falling spray being met by a current or currents of hot air introduced at the foot of the tower or shaft, and of a temperature sufficiently high to evaporate the brine or liquid, and separate the contained salt or matter, substantially by the means and in the manner hereinbefore described and shown.

"2. The arrangement, construction, and combination of parts comprising my improved apparatus or means for recovering salts from brine solutions or liquids arranged and operating substantially as hereinbefore described and illustrated."

The mode of operation is thus described:

"The mode of operating my invention is as follows: The air-heating portions of the apparatus having been brought to the required temperature, the exhauster in connection with the conduit e is set in motion, so as to draw hot air through the tower and thoroughly heat it. I then admit the brine current leading to the pipes f and at the same time turn on the cold air blast delivered by the blast pipes h. The cold air blows the brine in a fine spray from the delivery nozzles of the pipes f, and this spray showering down in the towers meets the ascending currents of highly heated air. The air is so hot that it completely evaporates the spray before it can reach the bottom of the towers, and thus separates the contained salts or other recoverable matters in the brine, the said separated salts or matters falling to the bottom of the towers and being ejected by the revolving valves r r which direct it to the pit s, from which it is removed in any convenient manner. The steam and vapors evolved by the evaporation of the brine are drawn away from the top of the tower by the exhauster as already described."

He has a tower or towers, heating apparatus, and pipes and openings for conducting the hot air at the foot on the sides of the tower into the tower, and means for forcing it upwardly. He has pipes with spray nozzles at the very top of the tower, through which the brine under pressure is forced into the tower downwardly through spraying nozzles. The descending brine in the form of spray is thus forced into the ascending current of *very hot air,* and the *great heat* evaporates the water, and the salt drops directly down to the bottom of the tower, and the water in the form of steam rises and escapes through suitable openings and a conduit. It is evident that Williams had no conception of a process for making dry or powdered milk by commingling ascending hot air with ascending milk spray and air under pressure, with the heat so regulated and controlled that the solids of the milk would not be at all changed, and would be left in a form which, on their being mixed with water, would reproduce pure sweet milk having all the properties it had before being subjected to the process.

It is self-evident that the process which Williams described for separating salt from brine, or extracting the salt from brine, will not produce the dried or powdered milk of the Stauf patent. Williams lays

great stress on the air being "heated to a very high temperature," and "the air becomes very highly heated." The real merit of his process was to drop brine in the form of spray into an ascending continuous current of very hot air, the hotter the better, so as to evaporate all the water contained in the brine before the salt contained therein reached the bottom of the tower. It is undoubtedly true that, should you substitute milk for brine in Williams' tower, and subject it to this great heat, you would get some dried or powdered milk. The water would be evaporated if the heat was great enough, but it does not follow that you would have powdered milk of any value for commercial purposes as dried milk, or which would produce milk having all the constituents of milk on being mixed with water. There is more to the Stauf process than merely injecting milk under pressure through spraying nozzles, or milk and air commingled into a tank or tower or receptacle having a strong current of hot air, with which it commingles, which receptacle has apertures for the escape of the hot air and vapor. The principle of the two processes, the operation and the result, are different. True, they have one thought in common, and that is separating the solids contained in a fluid from the water by means of a current of hot air under pressure into which the fluid is sprayed.

Coming to the question of infringement, I think this very plain. The defendant has adopted every step and feature of the Stauf process. It has hot air, regulated as to heat, introduced at the bottom sides of the tank (or call it tower), means for diverting the current to one side and allowing it to escape with the steam after the drying process has taken place, and the milk is introduced laterally under pressure with air through spraying nozzles, or it may be one nozzle on one side, or on the sides of the tank (not from the top downwardly); and the current of heated air is such as to carry the hot air commingled with the sprayed milk upwardly and along over receptacles for the solids of the milk as they drop down, the steam passing out through suitable receptacles. There is no doubt that the complainant uses the Stauf process. I have no doubt the defendant uses the same process, and in so doing infringes. It is true that the structure in which the process is carried on by complainant differs from that shown in the Stauf patent; but the process used remains the same. The defendant's structure is somewhat different from both, but not so as to change the process or result.

It will be noted and remembered that the Stauf process, as illustrated in the drawings, provides for heating the air so as to render it moisture absorbing; but it is immaterial how this is accomplished, provided it is made sufficiently moisture absorbing, and it is immaterial from what source it is produced, or at what point it enters the chamber, provided it does not seriously interfere with the spraying and vaporizing process. The claim is satisfied, irrespective of its source or point of entry, or the direction which it takes after entry.

The milk is sprayed into the chamber at any suitable or convenient point, by any suitable means, and the claim is satisfied, irrespective of by what means the spraying is done, or what direction the spray takes after its entry into the chamber, provided the air absorbs the moisture

contents of the liquid and then passes off, allowing the solids of the liquid to drop down, so as to be out of the active sphere of influence of the air current, or so as to be conveyed to any other suitable collecting space.

The claim of the Stauf patent reads as follows:

"The process of obtaining the solid constituents of liquids, such as blood, milk, and the like, in the form of powder, said process consisting in converting the liquid into a fine spray, bringing such spray or atomized liquid into a regulated current of heated air, so that the liquid constituents are completely vaporized, conveying the dry powder into a suitable collecting space away from the air current, and discharging the air and vapor separately from the dry powder."

The drawings show means for carrying out the process, but the patentee is not confined to the means shown. Other means may be used. It is not necessary that the heated air come in at the bottom, or that the milk be sprayed in upwardly. The essentials are: (1) Converting the milk into a fine spray; (2) bringing this spray or atomized milk into a regulated current of heated or moisture absorbing air, so that the liquid is completely vaporized; (3) conveying the dry powder to a suitable place for settling or deposit; and (4) procuring means or a place for the escape of the air and vapor separated from the powder or dried-out solids.

The Williams patent relates to a remote art, and is not, therefore, a pertinent reference to the claim of the Stauf patent.

I think the motion for a preliminary injunction should be granted.

## On Motion to Dismiss.

I see no ground whatever for the motion to dismiss as to the Stauf patent. It is, of course, true that the patent granted must be for the same invention originally described and claimed. But the farmer with little education, who invents a new and a useful electrical device and applies for a patent, is entitled thereto, provided he describes it and claims it in terms which can be understood, even if his description and claim be in uncouth and ungrammatical language, and every rule of correct English be more or less violated. It is not necessary that he be a Chesterfield, an Edison, a Murray, a Webster, a Brown, or a Clark. When he gets into the Patent Office, the question is: Has he described his invention, and has he claimed it? If so, both the specification and claims may be made over, redrawn, and put in proper form and language, and one claim divided into two or more. In attempts to be too ornate, many an inventor has failed to properly describe his invention, or properly claim that which he did describe.

In my judgment there was no material departure in the patent granted Stauf from the invention first described and claimed by him.

The motion to dismiss is denied, and the motion for a preliminary injunction is granted.

In any event, I will suspend the issuing of such injunction for a period of 30 days. If in the meantime the appeal referred to is heard and argued, the issue of such injunction will be suspended until a decision is given by the Circuit Court of Appeals. The papers in this case so fully and elaborately present the questions arising on the Wil-

liams patent, and the new question (if it be new) on the validity of the Stauf patent, that an appeal from this order, taken and heard with that on the appeal from the decision of Judge Hazel, will fully present the whole controversy and bring about a speedy determination. However, this court has no right or power to determine the course the parties shall pursue. Undoubtedly the Circuit Court of Appeals, on application, would advance the case now on appeal from the decision of Judge Hazel, and this as well.