## MERRELL–SOULE CO. v. RICO MILK PRODUCTS CO.

(District Court, E. D. Wisconsin. May 27, 1920.)

1. **Patents ⟐328—860,929, for a process of condensing and pulverizing milk, held infringed.**

   The Merrell-Soule patent, No. 860,929, for a process for condensing and pulverizing milk, one step in which is the admission of dry heated air through a slit into the drying chamber, is infringed by a process in which heated atmospheric air is admitted into the chamber through several openings, since it is manifest that such air must be dry to accomplish its purpose, and the difference in arrangement of the openings does not avoid infringement.

2. **Patents ⟐25—Use held to establish invention, not mere aggregation of process.**

   Where claims for a milk drying and pulverizing process were finally allowed by the Patent Office because the condensing of the liquid before the pulverizing produced substantially different and better product, the fact that other manufacturers, after the expiration of the patent covering the pulverizing process, deemed it necessary to use the condensation before pulverizing, shows that the claim of patentee that he produced an improved result, which was an invention, and not a mere aggregation of former processes, is well founded.

3. **Patents ⟐16—Possibility of achieving same result by old methods with greater skill does not disprove invention.**

   That it would be possible to achieve the results obtained by patentee by the use of old processes with greater care and skill than had been formerly used does not disprove invention, since the elimination of the necessity of great skill may itself show an improvement, evidencing invention.

⟐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Patents ☜328—860,929, for process for pulverizing milk, held sufficiently to disclose invention to warrant preliminary injunction.**

    The Merrell-Soule patent, No. 860,929, for an improved process for pulverizing milk and other liquids, *held*, in view of its general use, sufficiently to disclose invention to warrant a preliminary injunction against infringement.

In Equity. Suit by the Merrell-Soule Company against the Rico Milk Products Company for injunction to restrain infringement of a patent. Preliminary injunction awarded.

Howard P. Denison, of Syracuse, N. Y., and Edward Rector, of Chicago, Ill., for complainant.

Clarence E. Mehlhope, of Chicago, Ill., for defendant.

GEIGER, District Judge. This is an application for a preliminary injunction to restrain alleged infringement of letters patent numbered 860,929, issued July 23, 1907, covering a process of separating the moisture from liquids. The defendant is engaged in the business of condensing and pulverizing milk. The application is resisted on the ground that the patent is invalid and that the defendant is not shown to infringe. In a general way the process consists—dealing with the particular subject of drying or pulverizing milk—in introducing it to a concentrating chamber wherein it may be heated, and wherein also a vacuum or minus pressure is maintained for condensing purposes. When the product has been condensed to a requisite degree, it is withdrawn through a pipe and introduced into a desiccating chamber under pressure through a spraying device, and immediately carried through such chamber under the influence of air or gas as a desiccating agent, whereby evaporation takes place to such degree that the particles of solids are precipitated and removed, after passing through a screen, from a collecting chamber.

The claims are two in number:

"1. The process of obtaining the solid constituents of liquids and semiliquids in the form of powder, which process consists in concentrating the substance by removing a large percentage of the water therefrom, converting the concentrated mass into a fine spray, bringing such spray into a current of dry air or gas having an avidity for moisture, so that substantially all the remaining liquid constituents are separated, thereby conveying the dry powder into a suitable collecting space away from the air or gas current and discharging the air or gas separately from the dry powder."

"2. The process of obtaining the solid constituents of liquids and semiliquids in the form of powder, which process consists in concentrating the substance by removing a large percentage of water therefrom, converting the concentrated mass into a spray, bringing such spray into a current of dry heated air or gas, having an avidity for the moisture of the substance treated, retaining the atoms momentarily in said current so that substantially all the remaining moisture is converted into vapor and the product is prevented by the cooling effect of such evaporation from undergoing chemical change, conveying the dry powder into suitable collecting spaces away from the evaporizing current and discharging the air or gas separately from the dry powder."

In respect of the claimed invalidity of the patent, it is broadly asserted that, in so far as the method or process involves additional

steps to those disclosed in. one or more patents of the prior art, the process of the patent in suit discloses mere aggregation, and in no event additional steps, or a combination of steps, patentably novel. The defense of want of infringement is rested wholly upon the claimed absence, in the method in fact pursued by the defendant, of the use of "dry" air or "dry heated air."

The patent in suit was issued 13 years ago, and, while it has received no adjudication of validity, that circumstance is not controlling upon an application for preliminary injunction, if it can be said upon the proofs that the novelty and distinctiveness of the process is clear, and that by reason thereof it has received recognition and has been adopted. This phase of the case will be referred to later.

[1] Upon the case as made by. the parties, the question of infringement is not open, if the plaintiff can maintain its position respecting the fair interpretation of the claims of the patent. The only distinction claimed by the defendant is that it eliminates from its process the use of either "dry air" or "dry heated air," as taught by the respective claims of the patent; and the defendant insists that those terms import, not only indispensable elements but elements of such clear definitive scope as must exclude the step taken by the defendant. In lieu of using what the defendant claims must be rigidly defined as "dry air," or "dry heated air," its process is thus differentiated in this respect by its expert Hunziker:

"At East Troy [defendant's factory] heated atmospheric air was used, while patent 860,929 directs the use of dry air or dry heated air."

In differentiating the mechanism used by the respective parties in the use of either heated atmospheric air or dry heated air, in the respective processes, the expert says:

"The atomizing spray and the heated air at East Troy enter at one side of the drying chamber at an elevation about two-thirds from the bottom, while in patent 860,929 the atomizing spray and the dry heated air enter at or near the bottom of the drying chamber."

"At East Troy the heated air enters the dry chamber through a slot extending along the entire side of the dry chamber, while in patent 860,929 the dry heated air enters at the bottom through a series of openings."

A consideration not only of the art but also the defendant's interpretation of .it, as well as the objective of any process for drying and powdering milk, certainly discloses the fundamental idea that, howsoever the spraying and drying process may be practiced, it must exclude a step which would hinder the removal of moisture. In other words, no one would suggest, in carrying out the spraying process, the concurrent use of moisture-laden air. When, therefore, we have the three terms "dry air," "dry heated air," and "heated atmospheric air," the query is naturally presented respecting any essential distinction between the steps involving the use of one rather than the use of the other. True, it may be conceded that dry air may be cold, and that atmospheric heated air may be moist; but, with respect to the latter, can that be indulged when the. claim is pressed that identity of product in fact resulted in the use of it by the defendant? In other words, is it possible that the use of

moisture-laden,. but heated, atmospheric air was, or in fact could be, used by the defendant, or any one, in making a dry powder said to be identical in consistency and quality with that resulting from the use of what the art has called "dry air," or "dry heated air"? The argument, if identity of result is admitted, necessarily leads to the exclusion of the particular quality of "heated," or "dry heated," or "heated atmospheric air," as immaterial. "Air," or "heated air," will suffice.

The other slight differences in the mechanism or arrangement practiced by the defendant in its process, noted by its expert, are not, and have not, been insisted upon as sufficient to escape the charge of infringement, if plaintiff's patent is valid. The case is therefore advanced directly to a consideration of the validity of the patent, and the proposition over which the contention arises is directly suggested, in view of the art and the file history of the patent in suit, by the steps indicated in the respective claims through this language:

"Concentrating the substance by removing a large percentage of water therefrom." (See claims 1 and 2.)

This phase of the alleged invention was sharply in issue in the Patent Office; the applicant appreciating the force of patent references which deal with the conversion of liquids into powders by the spraying method. The applicant discussed this step, saying:

"It will be observed from the foregoing description that by reason of the preliminary removal of a considerable percentage of the moisture of the milk or other substance treated, as by concentration, atoms of the material while in the form of spray contain so small a percentage of moisture that such moisture can be and is instantly taken up by the air or gas in the dry state in which the latter enters the chamber *21*. From this it follows that the atoms need be subjected to the action of the heated air or gas only for an exceedingly brief period of time. Owing to the exceedingly short time of such action and to the fact that the heat of the air or gas is in a great measure offset or neutralized by the cooling effect of the rapid evaporation of the moisture, produced by the heated air or gas, it is entirely practicable to use such air or gas at a temperature much higher than could be employed, were the substance, when first deprived of much of its moisture, treated while in a highly divided state and promptly removed from the heated air or gas. In other words, the preliminary concentration so far reduces the percentage of liquid constituents that very brief treatment by heated air or gas will remove substantially all the moisture that remains; the cooling effect of the rapid evaporation will prevent excess heating of the solid constituents during such treatment, though the temperature be such as would effect the chemical change were the treatment of any given atom prolonged; and, finally, the solid constituents are removed from the influence of the heat immediately after separation is effected. As a consequence, the resulting product retains all the solid constituents in a normal and· natural state, so that the addition of a proper amount of moisture at any subsequent time will restore the substance to precisely its original condition. The dry powder is produced without pasteurizing· or sterilization, results which would be produced, were the solid constituents subjected for any considerable time to a temperature such as is employed in this process."

Again:

"The percentage of moisture to be removed by the preliminary concentration cannot be stated in precise terms for all substances, nor, in fact, for any

given substance, for the reason that the percentage of liquid, or vaporable and solid constituent varies more or less in different lots of a given substance. Speaking generally, however, it is found expedient to bring the substance, by preliminary treatment, to a substantially viscid condition, so that the moisture remaining in any given atom or globule of the spray shall be only such as can be removed during the rapid passage of such atom or particle through the desiccating chamber. As an example, with whole milk of good average quality, it has been found that the best results are attained when it is concentrated to a density of from 14 degrees to 15 degrees Baume. Fair results are obtainable with a preliminary concentration to a density as low as 10 degrees Baume."

The file history discloses the repeated rejection of all claims, and a refusal to recognize the contention of the applicant that the series of steps taken consecutively, but involving of necessity a preliminary reduction to a viscid condition, resulted in a product having qualities so improved, either in degree or in kind, as to credit invention to the applicant. The examiner pointed out that the specifications originally filed did not uphold such contention, and that, in view of the large variety of substances susceptible of treatment resulting in a great variety of products, "every possible degree of concentration" might be involved. (See office action May 31, 1907.) He pointed out further that by changing to a "definite degree of viscosity" before beginning to spray "is certainly not a part of the invention as claimed."

Thereupon the specifications and claims were amended, by incorporating the excerpt and the element or step above noted. In connection with the claim thus made, and after the examiner's observations, which, of course, contained his estimate of the applicant's process:

"There is no invention in first partially drying a material in one way and then completing the drying in another way."

The applicant responded:

"If that were all that was contemplated by the invention herein set forth, applicants would most respectfully bow to the decision of the examiner. * * *"

And after a reference to the Campbell patent, No. 762,277, applicant proceeded:

"Applicants are not asking for a claim which contemplates the mere partial drying of a liquid substance in one way and then completing the drying in another way per se; but they have discovered that by the series of steps herein set forth they have produced a new object never before contemplated by the prior art as expressed in the references set up, and that this new product has only been produced by the discovery, and that the series of steps have not been contemplated before."

Again:

"It is admitted that various substances have been dried by spraying processes, but it is not admitted that any one has heretofore discovered that there is a distinction between the effect produced by spraying the same substances at different densities, and it is submitted that there is nothing shown in the prior art which contemplates the production of a new product by first reducing the densities of the liquid as low as possible without denaturalization before spraying it for the purpose of producing a cooling effect upon the solids."

Upon the issue thus narrowed, the question was finally resolved by the Patent Office in favor of the applicant; and there is really presented upon this motion the single question whether the determination, in the light of the proofs, is now cast into doubt or into the field of debate, so that an otherwise clear infringement should not be preliminarily restrained. Upon this hearing the matters for consideration naturally fall into two classes:

First. The prior art, as it was open to consideration and in fact recognized by the Patent Office.

Secondly. The proofs, which deal with the art and its development since the advent of plaintiff's patent.

[2] Upon the first of these it is clear that the Patent Office was at first insistent upon dealing with the applicant's method as disclosing what might be called mere aggregation of prior art steps, or as introducing into the Stauf process, when applied, then recognized processes of condensation as a sort of preliminary, through purposeless, halting or interceptive step, and it is now urged that plaintiff's process consists of nothing more than first making condensed milk and then spraying and powdering it. It is apparent, however, that the art as practiced since the advent of plaintiff's patent has not considered, and does not now consider, the process as presenting a mere fortuitous and purposeless aggregation of rearrangement of steps.

Nothing better illustrates this than the adoption of the plaintiff's process by the defendant in this case. Nothing so clearly casts into doubt, if not utterly destroys, the probative force given to the affidavit presented by its expert, than the latter's own tribute to the merit of the patent in suit, in a somewhat comprehensive publication dealing with the general subject of condensed milk and milk powders. In such work, while not discussing many of the particular patents, notably the Stauf patent, dealing with spraying of milk, but rather comparing it with methods used in first solidifying and then grinding the product, the expert, writing in 1914, 7 years after the issuance of plaintiff's patent and 13 years after the Stauf patent, says, in particular reference to the process covered by plaintiff's patent:

"The milk is condensed in the vacuum pan to about one-third to one-quarter its volume. The condensed, but still fluid, milk is forced under pressure through a fine jet, casing to it be atomized and sprayed into a current of hot air in a vaporating chamber. This atomized fluid, forming a mist, offers the maximum surface for evaporation of its water. The hot air absorbs the moisture of the milk almost instantly, and the milk drops to the bottom of the chamber in the form of a snowlike powder. No grinding is necessary."

It may be observed that the commentator here appreciated the preliminary condensation as a fundamental element or step in the process, and, after quoting the claims dealing with the specifications, reaches this conclusion:

"The product of the Merrell & Gere process is without question superior to any milk powder manufactured by the various processes herein mentioned. It embodies the three all-important characteristics of a desirable and successful milk powder, namely: It contains less than the minimum amount of mois-

ture which permits a bacterial action; its butter fat is retained in the globular form, and it is therefore mixed with water readily, forming a complete emulsion; and its albumin is present in its natural noncoagulated and soluble form, insuring complete solubility of its dried milk in water."

The excerpts above, which disclose very clearly the considerations entering in the grant of the patent, when viewed in the light of the Stauf patent, No. 666,711, of January 29, 1901, and particularly in view of the force given to that patent in litigation (see Merrell-Soule Co. v. Powdered Milk Co. of America [D. C.] 215 Fed. 922; Id., 222 Fed. 911, 138 C. C. A. 391; Merrell-Soule Co. v. Natural Dry Milk Co., 222 Fed. 913, 138 C. C. A. 393), would seem to dispose of all reference to the prior art which was considered as bearing upon the validity of the Stauf patent. This is true, especially as that patent was held, and is here insisted by one and conceded by the other party, to mark a notable advance in the art or business of making powdered milk. It is rather late, the Stauf patent having expired, to urge processes such as were disclosed in the Just, Ekenberg, Campbell, Percy, La Mont, or Walker patents (see 215 Fed. [D. C.] 929) as having any bearing upon the validity of the patent in suit, in so far as this patent must plainly recognize the scope and distinctiveness of Stauf; and the consideration is therefore narrowed to the questions already stated, whether the patent in suit discloses a clear improvement on Stauf, in that it introduces the step of preliminarily condensing and then spraying and powdering.

Respecting the certain validity of a patent requisite to warrant the issuance of a preliminary injunction, the parties have discussed the recognition claimed by the plaintiff to have been accorded the patent in suit by licenses. The defendant has laid much stress upon the circumstance that the plaintiff, as owner of a number of patents, including Stauf, has embodied them all in its license agreements; and it is urged that the recognition ordinarily to be inferred from the acceptance of licenses is here destroyed by the circumstance that the licensees were of necessity obliged to bow to the Stauf patent; hence, dealing with the plaintiff as owner of both, unless they also accepted a license covering the patent in suit, it lay within the plaintiff's power to drive them entirely out of the powdered milk business. But as the patent in suit embodies as a fundamental and distinguishing element the introduction of the preliminary condensing step, the insistence by the defendants and all others—now that the Stauf patent has expired—upon introduction of that step into the process used by them, naturally raises the query: Why not use the Stauf method alone? It would seem to me that the answer to this question, upon the proofs in this case, is found in what the parties upon substantial agreement concede to be the highest essentials of a commercial milk powder and a process for making it. The Stauf process was so clearly distinguished in the litigation referred to as a method through which the raw product was serially passed through steps constituting a single process leading to drying through spraying in heated air, and the proofs in the present case, as well as the

adjudications upon the Stauf patent, disclose the intimacy of the relation between the air current, the pressure, and the volume of moisture at the time and point of spraying, as effecting both recovery and quality of the product.

Herein, and herein alone, does the patent in suit profess to advance beyond and improve upon Stauf; and it is hard to believe that the apparently universal desire of powdered milk manufacturers, including the defendant, to do the very thing which Merrell-Soule suggest, is a mere fortuity, which, if they saw fit, they might abandon or supersede by their present free choice of the Stauf method. Concededly, the preliminary condensation must directly affect the volume of moisture which, in pursuing the original Stauf method, is found when the milk reaches the spraying point, and therefore it directly affects the matter of pressure, the volume and temperature of the air currents, one or the other of which may in turn affect the volume of recovery, likewise the constituent elements of the product. The proofs, which rather clearly support the contention of the plaintiff in this respect, and therefore sustain its contention that the product is new in the sense that there is a larger volume of recovery, a greater solubility, and a greater freedom from moisture, do not seem to me to be met, except, first, by the flat assertion that such result cannot follow, or, secondly, that such conceded differences are in degree only, and could be overcome by the use of one or more of the other processes, if, as a matter of judgment or skill, it was desired to accomplish such result. But here, again, the query arises: Why, then, resort to the additional step suggested by plaintiff's patent? And it is my judgment that the real answer is found in the fact that, whether it be said to be a difference of degree, it is none the less so marked a difference as to give to the improved process a distinctiveness forbidding recognition of the Stauf process alone as a real rival.

We are now dealing with the probative force to be accorded to the evidence showing the recognition of the step of preliminary condensation. There is ample proof, as noted, of not only a general desire but an insistence upon taking such step—for some reason. When, therefore, the plaintiff argues that therein is found the strongest sort of proof of the indispensability of such step in achieving higher excellence and greater superiority of product, the mere suggestion that those who thus use the process may aim to make both condensed and powdered milk, the one by a partial, and the other by a complete, carrying out of the process, is not responsive to the plaintiff's contention that, in so far as powdered milk is thus made, the resulting product involves an appropriation and recognition of the merits of the patent. The latter does not profess to cover a process for making ordinary condensed milk with the alternative of merely continuing, if desired, to the spraying and powdering step, and thereby making merely such powdered milk as concededly may be made by the Stauf, or perhaps other, process.

[3] The novelty of the patent inheres in the continuity of steps taken in succession, but including the step of preliminary withdraw-

al of a large percentage of moisture, regardless of whether the amount so withdrawn brings the product to the proper character or consistency of ordinary commercial condensed milk. Therefore, when the proofs here show, as it seems to me they do, that the product resulting from pursuing the processes outlined in the plaintiff's position has the advantages pointed out in the proofs, the answer that the same results might be achieved with the exercise of greater or better judgment or skill in connection with other processes does not respond at all to the claim of patentable novelty. The latter may reside in the very circumstance that by pursuit of the new process dependence upon variable judgment or skill is eliminated, or at least minimized, and, if the result is greater certainty and an appreciably higher excellence in the particulars pointed out in the proofs, how can it be said not to evidence inventive endeavor?

[4] The record before us seems to answer this question, and thereby support the presumptive validity of the patent to a degree adequate to sustain a preliminary injunction; and the proofs adduced by the defendant to substantiate its claim of anticipation through prior use are not only inadequate to substantiate such claim, but do not cast doubt upon the plaintiff's showing.

The conclusion is that a preliminary injunction may be awarded, upon giving such undertaking as may be fixed, after hearing the respective parties.